UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORTH POINTE DEALINGS, INC.,

      Plaintiff,

v.

ARGO INTERNATIONAL, INC.,

      Defendant.

_____/

CIVIL ACTION NO. 07-10298

DISTRICT JUDGE JULIAN ABELE COOK, JR.

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION**:

I recommend that Defendant's Motion to Compel Arbitration and Dismiss be denied.

**II.**    **REPORT:**

      **A.**    **Procedural History**

North Pointe Dealings, Inc. (hereinafter "North Pointe") filed its Complaint against Argo International, Inc. ("Argo") and Robert Vekich on January 18, 2007. The Defendants filed a Motion to Dismiss on February 28, 2007, to which Plaintiff responded on March 21, 2007. Defendants filed a Reply on March 28, 2007, and the district judge entered an Order, on July 3, 2007, granting the Motion as to Vekich but denying it as to Argo.

On July 18, 2007, Argo filed the instant Motion to Compel Arbitration and to Dismiss the Case or in the Alternative, to Stay the Case. The Motion was referred to the magistrate judge by Order of Reference on July 24, 2007. North Pointe filed a Response to the Motion on August 13, 2007, and Argo filed a Reply Brief on August 23, 2007. The Motion was brought on for hearing on September 13, 2007. Following the hearing, the magistrate

judge solicited supplemental briefs, which were filed by Argo and North Pointe on October 3, 2007.

### B. Factual Background

Plaintiff, North Pointe, is a Dearborn based company comprised of individual investors residing in the Detroit metropolitan area. Beginning in approximately July 2006, North Pointe sought the assistance of Defendant, Argo, in an attempt to purchase cement for delivery and resale in Iraq. Thereafter, on August 31, 2006, North Pointe entered into a written contract (hereinafter referred to as the "Cement Contract" with non-party Century Cement Company Ltd. ("Century") for the purchase of 12,500 metric tons of cement which was to be delivered to the Port of Um Qusr, in Iraq. Argo was not a party to the agreement. The Cement Contract contained an arbitration clause providing that, in the event the parties were unable to resolve any dispute through friendly discussions, "then such dispute shall be settled by following the arbitration procedures of English law or by the United States of America." The contract further provided that "(s)uch arbitration shall be binding on both the buyer and the seller."

North Pointe's contract with Century required that it post a letter of credit in favor of Century for 99% of the purchase price, or $767,250.00. North Pointe's efforts to obtain such a letter of credit from American banks were unsuccessful. Accordingly, on or about September 28, 2006, North Pointe and Argo entered into a written contract entitled "Service Agreement for Bank Instrument Arrangement" (hereinafter "Service Agreement") which provided that Argo would facilitate the issuance of the letter of credit for North Pointe. The Service Agreement contained the following arbitration clause:

2

AGREEMENT: GOVERNING LAW AND ARBITRATION

The parties hereby agree to settle any dispute arising from or relating to this agreement amicably. If settlement is not reached, the dispute in question shall be submitted for arbitration in FRANCE at the PARIS CHAMBER OF COMMERCE. The findings of the court of arbitration shall be considered as final, irrevocable and binding upon both parties. At all times, English language shall prevail.

Despite the issuance of a letter of credit, North Pointe was unable to secure the delivery of the cement by Century. On or about November 3, 2006, North Pointe and Argo entered into yet another agreement entitled "Memorandum of Understanding" (hereinafter "MOU"). In the MOU, North Pointe agreed to provide $767,250.00 to Argo "to financially pay off the 90 day leased documentary letter of credit ("DLC") . . . issued for the purchase of 12,500 M/Tons of ordinary Portland cement 42.5 (British standard) directly to the cement supplier (Century) in order to release the leased bank instrument on its expiry . . .." Century, however, was not a party to the MOU. Argo was to provide the money to Century only after having satisfied itself that the cement had been properly delivered. Argo further agreed to make the necessary arrangements for handling of the cargo and to make final payment to the shipping agent. Argo also agreed to keep North Pointe informed of the progress of the transaction. In the event of "any discrepancy in the matter of delivery of cement beyond November 27, 2006 which is the latest date of shipment as indicated in the documentary letter of credit," Argo was obligated by the MOU to return the funds to North Pointe "without any protest or deductions." The final substantive paragraph of the MOU provided as follows:

This Memorandum of Understanding shall be part and parcel of the Cement Contract signed by Fadhel Al-zuad of North Pointe Dealings, inc. (sic) and Syaad Jamaluddin

> representative of Cement century (sic) Company Limited, if any dispute or disagreement arises out of this MOU or the Contract, This Memorandum of Understanding and Its Terms shall prevail over the Contract.

The MOU contained no arbitration clause.

The Complaint claims that Argo violated several terms of the MOU. North Pointe alleges that Argo failed to keep it sufficiently informed of the status of the cement transaction and, in fact, transmitted inaccurate reports concerning it. The Complaint further alleges that Argo failed to make successful arrangements for the handling and delivery of the cement; failed to provide Plaintiff with critical documentation relating to the transaction; and refused to return the purchase money to North Pointe when the cement remained undelivered after the agreed upon deadline. The Complaint charges Argo with breach of contract based upon its alleged failures to comply with the MOU, and with statutory and common law conversion of the purchase monies.

In the motion under consideration here, Argo maintains that North Pointe agreed to arbitrate the issues raised in the Complaint, and that an Order of this Court compelling such arbitration is warranted under the Federal Arbitration Act, 9 U.S.C. §§1 et seq., and the Michigan Arbitration Act, M.C.L.A. §§ 600.5001 et seq. North Pointe denies that it is contractually obligated to arbitrate the dispute, and maintains that an order compelling such arbitration would be contrary to law.

**C. Analysis**

Title 9 U.S.C. § 2 provides as follows:

> **Section 2. Validity, irrevocability and enforcement of agreements to arbitrate**

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Title 9 U.S.C. § 2. The question of whether an issue is an arbitrable one under a contract of arbitration is a legal question for the court rather than for an arbitrator, in the absence of a contract giving the arbitrator such jurisdiction. International Union v. Benton Harbor Malleable Indus., 242 F.2d 536 (6th Cir. 1957), cert. denied, 78 S.Ct. 15 (1957). "Arbitration . . . is a matter of consent not coercion." Volt Info. Scis. v. Bd of Trs of Leland Stanford Junior Univ., 109 S.Ct. 1248 (1989). Because the Act reflects, at bottom, a policy guaranteeing enforcement of private contractual arrangements, a court should first examine whether the parties agreed to arbitrate a dispute, and not to general policy goals. EEOC v. Waffle House Inc., 122 S.Ct. 754 (2002). On a Motion to Stay or Dismiss Proceedings in favor of arbitration, a court must first determine whether an agreement to arbitrate exists, and then whether the dispute between the parties falls within the scope of the matters they agreed to arbitrate. Prima Paint Corp. v. Flood and Conklin Mfg. Co., 87 S.Ct. 1801, 1805-06 (1967). Pursuant to FAA §2, an agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. In determining the existence of such grounds, courts may apply state law governing issues concerning the validity, revocability and enforceability of contracts in general. Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987).

In construing the terms of a contract under Michigan law, a court's primary responsibility is to enforce the intent of the parties. Wonderland Shopping Center Venture Limited Partnership v. CDC Mortgage Capital, Inc., 274 F.3d 1085, 1092 (6th Cir. 2001). The court must examine the contract as a whole, giving effect to all parts and language of a written agreement according to their "ordinary and natural meaning." Id. at 1092 (citing City of Wyandotte v. Consol. Rail Corp., 262 F.3d 581, 585 (6th Cir. 2001)). When a written agreement refers to a separate document for additional contract terms, the court must read the writings together. Wonderland, 274 F.3d at 1092 (citing Forge v. Smith, 458 Mich. 198 (1998)).

> In a written contract a reference to another writing, if the reference be such as to show that it is made for the purpose of making such writing apart of the contract, is to be taken as a part of it just as though its contents had been repeated in the contract. But if the reference be made for a particular purpose, expressed in the contract, it becomes part of it only for that purpose.

Whittlesey v. Herbrand Co., 217 Mich. 625, 628 (1922) (citing Short v. Van Dyke, 50 Minn. 286).

Relying upon the foregoing propositions of law, Defendant maintains that the MOU must be read together with the Cement Contract or, alternatively, with the Service Agreement, and that such a reading makes it clear that the parties intended to utilize the dispute resolution clause of the Cement Contract if any dispute or disagreement arose out of either the MOU or the Cement Contract. The argument relies in the first instance upon Clause Fourteen of the Cement Contract wherein the buyer (North Pointe) and the seller (Century) agreed to resolve "all disputes in connection with this contract" which could not be resolved to their satisfaction through friendly discussions "by following the arbitration

6

procedures of English law or by the United States of America (sic)." The same clause provided that such arbitration would be binding "on both the buyer (North Pointe) and the seller (Century)." Argo, a non-party to the Cement Contract, subsequently agreed with North Pointe that the MOU "shall be part and parcel of the Cement Contract (sale purchase agreement) . . ., if any dispute or disagreement arises out of this MOU or the contract." The MOU further provided that its terms "shall prevail over the contract (Cement Contract)."

The lynchpin of Argo's argument is its contention that "the MOU expressly adopts the terms of the Cement Contract . . .." (Defendant's Brief, page 14). Unfortunately, there is no evidence to support that contention. In fact, the express language of the MOU is precisely to the opposite effect ("this memorandum of understanding shall be part and parcel of the Cement Contract . . .."). There simply are no words in the MOU whose plain meaning could be held to represent an intent to incorporate the Cement Contract into the memorandum.[1]

I am satisfied that the mere mention of a separate agreement is insufficient to incorporate it into a subsequent contract. The Whittlesey decision relies upon Rorabacher v. Lee, 16 Mich. 169 (1867), which dealt with "a writing containing a promise to pay a certain sum 'according to the conditions of a certain bond' executed by [a third party] to plaintiff." The holding is founded upon the fact that the meaning and effect of the defendant's undertaking in the second contract could not be understood without reference

---

[1] Based on my reading of the agreements attached to the motion papers, the MOU fails to clearly identify the Cement Contract. It makes specific reference to the contract "signed by . . . Syaad Jamaluddin representative of Cement century (sic) Company Limited . . .." The Cement Contract appended to the party's motion papers was not signed by Jamaluddin.

7

to the first. Thus, the earlier bond became an essential part of the later contract. The other cases cited in Whittlesey are to the same effect. The facts of the case at hand, however, are easily distinguishable. Both parties to the MOU clearly were aware of the existence of the Cement Contract. It was attached as an exhibit to the Service Agreement under which Argo facilitated the issuance of a documentary letter of credit for North Pointe. But specific reference to any particular term of the Cement Contract is unnecessary to the performance of the MOU. Nothing in the Memorandum of Understanding requires resort to the Cement Contract for understanding or clarity of either party's rights or duties. Argo offers no factual or contextual support for its argument that the Cement Contract was incorporated into the MOU. The only provisions of the original Cement Contract remaining unfulfilled were the final delivery of the cement and the payment of 99% of the purchase price. What purpose the claimed incorporation of the other, completed terms into the MOU would serve is unexplained. Conversely, incorporation of the MOU into the Cement Contract (while questionable as a matter of law)[2] would tend to refine the terms of the Cement Contract remaining unfulfilled, and clarify the means by which North Pointe would fulfill them. If the sole purpose of Argo's asserted incorporation of the Cement Contract into the MOU was to provide for arbitration, it was certainly addressed clumsily. A simple, direct agreement to arbitrate the terms of the MOU would have sufficed. The Service Agreement contains such a provision - demonstrating that both Plaintiff and Defendant knew how to provide for arbitration between them. Thus, I am satisfied that the circumstances surrounding its execution, as well as the language employed, supports the conclusion that the MOU was

---

[2] Neither party was able to cite authority for the proposition that a subsequent agreement between them could alter Century's rights under the Cement Contract.

intended to be incorporated into the Cement Contract, and not vice versa.

Even if this court indulges Defendant's argument that the MOU "incorporated" (despite plain language to the opposite effect) the Cement Contract, the Defendant is not benefitted. No particular provision of the Cement Contract is mentioned in the MOU. Thus, the entirety of the agreement must have been absorbed under the Defendant's theory. Under such circumstances, the general proposition that North Pointe could assign its rights and obligations under the Cement Contract would be subject to clause 16-5, which specifically prohibits such assignment absent the "prior written consent" of Century ("the seller"). Defendant offers no evidence of such prior written consent, or any argument or evidence whatsoever that the MOU operated to assign any right of Century to Argo.

In my view, Clause 14-1 of the Cement Contract, fairly interpreted, makes it clear that arbitration applied to all disputes between North Pointe and Century Cement, if they could not be resolved by "friendly discussions" to the satisfaction of the "parties." Only North Pointe and Century were parties to the Cement Contract. It is illogical to assume that each individual party bound itself to arbitrate disputes between itself and such agents or servants as it might employ in meeting its obligations to the opposite party under the contract. Although such disputes could rationally be characterized as "in connection with" the Cement Contract or the performance thereof, I find such an interpretation of the arbitration obligation to be so attenuated as to be unreasonable. Therefore, even if Clause 14-1 is assumed to have been incorporated by reference into the MOU, it does not establish an undertaking by North Pointe to arbitrate disputes with Argo, but only disputes with Century Cement. This is so because Clause 14-1 provides for arbitration of disputes between the parties to the Cement Contract. Argo is not a party to the Cement Contract,

and could not become a party absent an agreement between the original parties. See Quality Products v. Nagel Precision, Inc., 469 Mich. 362, 372-73 (2003) (Mutuality is the centerpiece to waiving or modifying a contract, just as mutuality is the centerpiece to forming any contract).

It is beyond dispute that the MOU contains no arbitration clause. While it mentions the Cement Contract, it also plainly provides that the terms of the memorandum "shall prevail over the contract." At the very least, the absence of an arbitration obligation in the MOU itself creates an ambiguity. As Argo drafted the MOU, the ambiguity should be interpreted in favor of North Pointe. Brown v. Considine, 108 Mich.App. 504 (1981).

Argo's alternative argument, that the MOU somehow incorporated the terms of the Service Agreement is even less persuasive. No mention of that document appears in the MOU. Furthermore, the sole purpose of the Service Agreement was to provide for the issuance of a documentary letter of credit on behalf of North Pointe. That purpose was fully accomplished prior to the execution of the MOU, and Argo offers no explanation as to why the incorporation of a fully completed contract would serve the interests of either party to the MOU. No provision of the Service Agreement is necessary to the understanding of the parties' rights and duties under the MOU.

Argo argues that both the Federal Arbitration Act and the Michigan Arbitration Act provide for dismissal or a stay of litigation pending the completion of arbitration. Defendant further maintains that both federal and state policies favor arbitration. Both propositions are correct, so long as the parties to the underlying commercial transaction have entered

10

into a binding agreement to arbitrate disputes. In the absence of such an agreement, neither the federal nor the state statute applies.

North Pointe argues that its arbitration obligation, even if it is viewed as incorporated into the MOU, is revocable under Michigan law. Plaintiff relies on the provisions of MCL 600.5001(2), which provides as follows:

> A provision in a written contract to settle by arbitration under this chapter, a controversy thereafter arising between the parties to the contract, with relation thereto, and in which it is agreed that a judgment of any circuit court may be rendered upon the award made pursuant to such judgment, shall be valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the recision or revocation of any contract.

MCL 600.5001(2). Plaintiff observes, correctly, that there is no language in the arbitration provisions in this case which evidence an agreement that a judgment of any circuit court might be rendered upon an award pursuant to an arbitration clause. North Pointe cites Wold Architects and Engineers v. Strat, 474 Mich. 223 (2006) in which the Michigan Supreme Court distinguished between "statutory arbitration agreements" and "common law arbitration agreements." The court in Wold determined that "statutory arbitration agreements" meet the requirements of MCL 600.5001 and cannot be unilaterally revoked. Id., at 229-30. "Common law arbitration agreements," on the other hand, do not conform to the statute, and permit a party to withdraw from the arbitration process at any time prior to an actual award. The Wold court determined that parties wishing to conform their agreements to the statute must include in writing the requirement that a circuit court may enforce them. North Pointe argues that the absence of such language in the provisions at issue here renders any arbitration obligation revocable at will.

11

North Pointe argues further that the provisions of the Federal Arbitration Act do not apply in this case. Title 9 U.S.C. §2 only applies when, after first looking to substantive state law, a court determines that an enforceable arbitration agreement exists. Plaintiff refers this court to Ford Motor Co. Ltd. v. M/S Marie Gorthon, 397 F.Supp. 1332, 1336 (D. MD 1975). The court in that case held that the term "referable to arbitration" in the statute refers to circumstances in which the parties to an agreement "have bound themselves to arbitrate as a condition precedent to recovery . . .." Plaintiff also cites the well established proposition that "[t]he FAA directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so. Waffle House, 534 U.S. at 293. "[T]he purpose of Congress in 1925 [in enacting the FAA] was to make arbitration agreements as enforceable as other contracts, but not more so." On the theory, enunciated above, that any arbitration obligation on its part was revocable under Michigan law, North Pointe argues that the FAA does not apply to make them enforceable.

In response, Argo cites the recent decision of this court (Judge Feikens) in Mechanical Power Conversion v. Cobasys, ___ F.Supp. 2nd ___, 2007 WL 2335507 (E.D. Mich.). The court in Mechanical Power recognized that the Federal Arbitration Act permits arbitration agreements to be revoked only "upon such grounds as exist at law for the revocation of any contract." 9 U.S.C. §2. The court, however, relied upon Inland Bulk Transfer Co. v. Cummins Engine Co., 332 F.3d 1007, 1014 (6th Cir. 2006) for the proposition that the statute "has been interpreted to mean that only doctrines that are generally applicable to all contracts, such as fraud or duress, may be used to invalidate an arbitration clause; any state law, regardless of whether its genesis was legislative or

12

judicial, is pre-empted if it only applies to arbitration clauses." Because it found no generally applicable doctrine of contract law to have been alleged, the court determined that the arbitration clause in Mechanical Power was valid and enforceable, such that arbitration should be compelled. On that basis, I conclude that the agreement by North Pointe in the Cement Contract to arbitrate disputes, if it had been incorporated into the MOU would be enforceable. For all of the reasons stated in the earlier sections of this report, however, I find that Argo has failed to establish that the Cement Contract was so incorporated. Accordingly, I recommend that the Defendant's Motion be denied.

### III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The

13

response shall address specifically, and in the same order raised, each issue contained within the objections.

        s/Donald A. Scheer
        DONALD A. SCHEER
        UNITED STATES MAGISTRATE JUDGE

DATED: October 29, 2007

_____

## CERTIFICATE OF SERVICE

    I hereby certify on October 29, 2007 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on October 29, 2007. **None.**

        s/Michael E. Lang
        Deputy Clerk to
        Magistrate Judge Donald A. Scheer
        (313) 234-5217